UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

REGINALD D. WASHINGTON, JR.,

Plaintiff,

vs.                                    Case No.   2:10-cv-485-FtM-99SPC

TIMOTHY BUDZ, in his individual and
official   capacity   as   Facility
Administrator   at   Florida   Civil
Commitment Center, JACQUES LAMOUR,
Doctor,   in   his   individual   and
official capacity as Chief Health
Official at Florida Civil Commitment
Center, HOWARD PINSKY, ARNP, in his
individual and official capacity as
an ARNP at Florida Civil Commitment
Center, B. WEBSTER, ARNP, in his
individual and official capacity as
an ARNP at Florida Civil Commitment
Center, FNU Hagood, ARNP, in his
individual and official capacity as
an ARNP at Florida Civil Commitment
Center,

Defendants.

_____

**OPINION AND ORDER**

**I. Status**

Plaintiff Reginald D. Washington (Washington or Plaintiff),

who is civilly detained at the Florida Civil Commitment Center

("FCCC"), has a *pro se* civil rights complaint pending before the

Court (Doc. #1, Complaint).   The Complaint names the following

individuals in both their individual and official capacities as

Defendants: Timothy Budz, Facility Administrator at the FCCC; Dr.

Jacques Lamour, M.D., Chief Health Official at the FCCC; Howard

Pinsky, ARNP at the FCCC; B. Webster, ARNP at the FCCC; and, Mr.

Hagood, ARNP at the FCCC.  Complaint at 2-3.  The Complaint alleges Fourteenth Amendment and pendent state law claims against Defendants in connection with Plaintiff's medical care at the FCCC. Id. at 11.  More specifically, Plaintiff avers that Defendants were deliberately indifferent and negligent in not providing him with adequate and proper medical care and pain medication for a lump in his groin area/hernia for a 24-month period causing Plaintiff to suffer needless pain.  Id. at 9-10.

Defendants filed a Motion for Summary Judgment on June 29, 2012, contending that they are entitled to summary judgement as a matter of law (Doc. #49, Motion).  Defendants submit the following exhibits in support of their Motion (hereinafter referred to as "Def. Exh. _"):

Exhibit A - Plaintiff's Medical Records (comprising 299 pages);

Exhibit B - Affidavit of Jacques Lamour, M.D.

Exhibit C - Affidavit of Timothy Budz.[1]

The Court duly advised Plaintiff of the tenets of Rule 56, and Plaintiff filed a response in opposition to the Motion (Doc. #52, Response).  Plaintiff submits the following exhibits in support of his Response (hereinafter referred to as "Pl. Exh. _"):

Exhibit A - Grievances Submitted by Plaintiff;

---

[1]Mr. Budz' Affidavit is not signed and is not notarized.  See Def. Exh. C.  Consequently, the Court will strike the Affidavit and not consider it in ruling on the Motion.

Exhibit B - Resident Sick Call Requests Submitted by Plaintiff;

Exhibit C - Progress Notes and Excerpts From Plaintiff's Medical File;

Exhibit D - Progress Notes and Excerpts From Plaintiff's Medical File;

Exhibit E - Affidavit of Plaintiff, Reginald D. Washington Jr., and Affidavit of Dominic Gaddis.

This matter is ripe for review.

## II. Applicable Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Coward, 631 F.3d 1337, 1341 (11th Cir. 2011)(internal quotations and citations omitted). See also Fed. R. Civ. P. 56(c)(2). "The moving party may meet its burden to show that there are no genuine issues of material fact by demonstrating that there is a lack of evidence to support the essential elements that the non-moving party must prove at trial." Moton, 631 F.3d at 1341 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The standard for creating a genuine dispute of fact requires the court to "make all *reasonable* inferences in favor of the party opposing summary judgment," Chapman v. Al Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)(en banc)(emphasis added), not to make all *possible* inferences in the non-moving party's favor. As a *pro se* litigant, Plaintiff's pleadings are construed more liberally than those of a party

represented by an attorney.   Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002).

If the moving party meets its burden of production, the non-moving party "must present evidence beyond the pleadings that shows a reasonable jury could find in its favor to avoid the entry of summary judgment." Bell v. Sec'y, Fla. Dep't of Corr., 2012 WL 4465268 (11th Cir. 2012)(citing Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1301 (11th Cir. 2009); see also, Beard v. Banks, 548 U.S. 521, 529   (2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999).  If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, (1986) must be drawn in favor of the non-moving party, but those inferences are drawn "only to the extent supportable by the record." Penley v. Eslinger, 605 F.3d 843, 848 (11th Cir. 2010)(citation omitted).  The court, however, "must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, [the court's] inferences must accord deference to the views of prison authorities." Beard, 548 U.S. at 530.   "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Cuesta v. School Bd. of Miami-Dade County, 285

F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Conclusory allegations based on subjective beliefs are not sufficient to create a genuine issue of material fact. Leigh, 212 F.3d at 1217. Further, "allegations in affidavits must be based on personal knowledge, and not be based, even in part, 'upon information and belief.'" Pittman v. Tucker, 213 F. App'x 867, 870 (11th Cir. 2007)(quoting Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002)). In summary, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. Scott v. Harris, 550 U.S. 380.

### III. Finding of Facts and Conclusions of Law

#### A. Facts

The following is a chronological history of Plaintiff's request for medical care and the medical care rendered to Plaintiff at the FCCC as supported by the record.

On June 3, 2008, after playing basketball, Plaintiff presented himself to the FCCC medical department "complaining of right-sided

suprapublic pain and right testicular pain." Def. Exh. A at 152. He said he has had the pain "for a while" and first noticed it after doing sit-ups.  Id.  Plaintiff was examined by Defendant Pinsky and diagnosed with a right inguinal hernia.  Id. at 153. Plaintiff was instructed on how to reduce the hernia, the importance of it not being reduced, to use ice, to come back if it stayed out and was painful and declare a medical emergency.  Id. Pinsky also ordered Plaintiff a hernia belt because he did not have the right size belt for Plaintiff.  Id.

On June 6, 2008, upon referral by the nurse practitioner, Plaintiff was evaluated by Dr. Lamour for a "right inguinal hernia" Id. at 151.  Plaintiff stated he has "no pain."  Id.  Upon examination, Dr. Lamour found "no bulge," "no mass palable on lying or in standing position even when the patient coughs," "no bulging and the scrotum appeared to be normal."  Id.  Dr. Lamour "doubt[ed]" that Plaintiff had a hernia, but permitted Plaintiff to continue to the use the belt during physical activity.  Id.

On July 8, 2008, Plaintiff submitted a Sick Call Request stating he is "having persistent pain in [his] right groin area."  Pl. Exh. B-1.

On July 11, 2008, Plaintiff was seen in the FCCC medical department complaining of "right-sided inguinal pain" and was examined by Defendant Pinsky.  Def. Exh. A at 146-147.  The hernia was "not out" at that time, but Plaintiff stated "it is pushing out more than it has been in the past."  Id. at 146.  Defendant Pinsky determined "there is a right-sided inguinal hernia easily reducible."  Id.  Pinsky provided Plaintiff with a hernia belt, helped him adjust it, and told him to return if the hernia stays out and he is not able to get it back in within an hour.  Id.

On August 21, 2008, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 143.  No complaints are noted about Plaintiff's hernia.  Id.

On September 5, 2008, Plaintiff was called to the FCCC medical department for an evaluation of right inguinal hernia by Dr. Lamour.  Id. at 142.  Plaintiff stated he wanted surgery. Plaintiff told Dr. Lamour that the hernia belt helped.  Id.  Upon examination, Dr. Lamour found no clinical evidence of a hernia. There was "no bulge in the lying and standing position, even when the patient coughs, there is no bulge," "no tenderness," "no mass palable," "no inguinal node," "no hernia seen on the scrotum."  Id. Dr. Lamour recommended seeing Plaintiff "every 90-120 days" and permitted Plaintiff to continue to use the belt during physical activity.  Id.

On September 26, 2008, Plaintiff went to the FCCC medical department for an evaluation of right inguinal hernia by Dr. Lamour. Id. at 141. Dr. Lamour noted that, during his examination of Plaintiff on September 5, 2008, he found "no clinical evidence of a right inguinal hernia." Id. Consequently, Dr. Lamour concluded "there is no treatment required." Id. He recommended seeing Plaintiff again "in three to four months for reevaluation." Id.

On December 1, 2008, Plaintiff submitted a Sick Call Request stating he is "having pain in [his] right groin area. Also when [he] stand[s] or walk[s] for a while a lump come [sic] up in [his] right groin." Pl. Exh. B-2. Plaintiff was advised that he was previously seen for the problem and was scheduled to be reevaluated in one month. Id. Further, Plaintiff was told to resubmit a sick call if the pain level increases. Id.

On December 10, 2008, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Def. Ex. A at 134. No complaints are noted about Plaintiff's hernia. Id.

On January 7, 2009, Plaintiff submitted a Sick Call Request stating he is "still having pain in [his] right groin area." Pl. Exh. B-3. Plaintiff also stated his hernia belt was "worn out" and requested a new belt. Id. According to the response, Plaintiff was referred to the ARNP and was told to being his old belt. Id.

On January 29, 2009, Plaintiff presented himself to the FCCC medical department complaining of "left shoulder pain and needing a new hernia belt." Def. Exh. A at 133. Plaintiff was examined and evaluated by Defendant Pinsky. Plaintiff was diagnosed with Tendinitis to the left shoulder. Id. Plaintiff received an injection in his shoulder and was instructed "not to play basketball." Id. No complaints are noted about Plaintiff's hernia. Id.

On April 1, 2009, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 128. No complaints are noted about Plaintiff's hernia. Id.

On May 13, 2009, Plaintiff presented himself to the FCCC medical department complaining again of "left shoulder pain." Id. at 126. Plaintiff was examined and evaluated by Defendant Pinsky. Plaintiff stated that although he was instructed in January not to play basketball, he "went back to playing basketball [and] lifting weights straight away." Id. Plaintiff received another injection in his shoulder, which "immediately relieved" the pain. Plaintiff

was instructed "not to do any working out, not to do any resistance for two months." Id.  No complaints are noted about Plaintiff's hernia. Id.

On May 14, 2009, Plaintiff presented himself to the FCCC medical department  for a follow-up appointment on his shoulder.  Id. at 39.   Plaintiff  was examined and evaluated by Defendant Pinsky. Plaintiff's shoulder was examined and he had "full range of motion" "with 95% improved."  Id.  Plaintiff was "evaluated for physical therapy" and "discharged."  Id.  No complaints are noted about Plaintiff's hernia. Id.

On June 16, 2009, Plaintiff presented himself to the FCCC medical department for evaluation of "his right inguinal hernia."  Id. at 120.   Plaintiff was examined and evaluated by Defendant Pinsky. Id.  Defendant Pinsky determined "it has gotten larger since [his] last  evaluation  on  07/2008,"  but  concluded  "[i]t  is  still reducible."  Id.  Pinsky referred Plaintiff for further evaluation with Dr. Lamour.  Id.

On June 23, 2009, upon referral by Defendant Pinsky, Plaintiff was evaluated by Dr. Lamour for a "right inguinal hernia" Id. at 118. Plaintiff stated it "bothers him when playing ball and when doing exercises."  Id.  Upon examination, Dr. Lamour found "no bulge on standing or lying position," "no bulge when patient coughs," and "no hernia observed."  Id.  Dr. Lamour found "no clinical evidence of right inguinal hernia" and concluded no treatment was required. Id.

On July 9, 2009, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia.  Id. at 116. No complaints are noted about Plaintiff's hernia. Id.

On July 22, 2009, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia.  Id. at 112. No complaints are noted about Plaintiff's hernia. Id.

On July 29, 2009, Plaintiff was seen in the FCCC medical department "in part for toe nail fungus" and to have his "hernia checked that has existed for about a year."  Id. at 110.  Plaintiff was examined and  evaluated  by  Defendant  Hagood.  Id.  Upon  examination, Defendant Hagood determined that Plaintiff had a "R side reducible inguinal hernia." Id.  Hagood indicated he would "consult with Dr. Lamour for both problems."  The same day, Dr. Lamour made an entry in Plaintiff's chart at "17:20" stating "Pt was evaluated for rt inguinal hernia.  There was no indication for surgery." Id.

On August 14, 2009, Plaintiff submitted a Sick Call Request stating he is "still having pain in [his] right groin area." Pl. Exh. B-4. Plaintiff stated that it causes numbness when he works out, coughs or stands too long. Id. Plaintiff claimed that the pain and numbness "has got worse." Id. In response, Plaintiff was told he would be scheduled for an appointment. Id.

On August 21, 2009, Plaintiff was seen in the FCCC medical department for "right inguinal hernia." Def. Exh. A at 109. Plaintiff was examined and evaluated by Defendant Hagood. Id. A notation reads "resident reports truss helps." Id. at 110.

On September 10, 2009, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 109. No complaints are noted about Plaintiff's hernia. Id.

On October 19, 2009, Plaintiff submitted a Sick Call Request stating he is "having pain in [his] right groin area," and requested "a new hernia belt." Pl. Exh. B-5. Plaintiff was advised he would be scheduled for an appointment. Id.

On October 27, 2009, Plaintiff was seen in the FCCC medical department for right "groin pain" and right "inguinal hernia." Def. Exh. A at 108. Plaintiff was examined and evaluated by Defendant Webster. Id. A notation reads "plays basketball, wt lifting, etc. current hernia belt is worn out." Id. Upon examination, Defendant Webster noted that the hernia was "easily reducible" and "R Ing hernia, very small." Id. A new belt was provided to Plaintiff and he was instructed to "adjust activities accordingly." Id.

On October 29, 2009, Plaintiff was seen in the FCCC medical department for reevaluation by Dr. Lamour of a right inguinal hernia. Id. at 108. According to the chart, Plaintiff states that he had the hernia "for years." Id. Plaintiff told Dr. Lamour that the hernia causes "discomfort and pain when he exercises and walks for a long time." Id. Dr. Lamour determined that Plaintiff had a very small easily reducible inguinal hernia and there was "no indication for surgery at this point." Id.

On November 3, 2009, Plaintiff had a sonograms of his testicles and the right inguinal area. Id. at 85-86. William Hearn, D.O., interpreted the tests and concluded that the sonogram of Plaintiff's right inguinal area was negative, but the songram of Plaintiff's testicles revealed small to moderate bilateral hydoceles. Id.

On November 11, 2009, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 105. No complaints are noted about Plaintiff's hernia. Id.

On December 12, 2009, Plaintiff submitted a Sick Call Request stating he is "having pain in [his] right groin area" and has "a lump which becomes numb there." Pl. Exh. B-6. In response, Plaintiff was told he would be scheduled for an appointment. Id.

On December 16, 2009, Plaintiff was seen in the FCCC medical department for "groin lumps and pain," as well as other unrelated medical conditions. Def. Exh. A at 104. Plaintiff was examined and evaluated by Defendant Webster. Id. Plaintiff complained that the "tenderness" is "exacerbated when playing basketball." Id. Upon examination, Defendant Webster noted "easily reducible R Ing hernia." Id. Plaintiff was provided with a hernia belt and prescribed medications, including a ninety-day supply of 500 mg of Tylenol. Id. Plaintiff was advised to follow up in one month. Id.

On January 29, 2010, February 11, 2010 and February 12, 2010, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 102-103. No complaints are noted about Plaintiff's hernia. Id.

On February 16, 2010, Plaintiff presented himself to the FCCC medical department complaining of "stomach pain on and off" that he has had for approximately "one month off and on." Id. at 101. Plaintiff told the nurse "if he lays flat the discomfort goes away." Id. Plaintiff also told the nurse that he has a history of a hernia and "thinks it may be related." Id. Plaintiff was advised to write a sick call slip and limit strenuous exercise until he speaks with Dr. Lamour. Id.

On February 18, 2010, Plaintiff was seen in the FCCC medical department for mild abdominal discomfort "when coughing." Id. at 100. Plaintiff was provided Malox. Id.

On February 24, 2010, Plaintiff submitted a Sick Call Request stating he needs an appointment "ASAP!" because his stomach is bothering him. Pl. Exh. B-7. Id. Plaintiff was advised that an appointment would be scheduled. Id.

On February 26, 2010, Plaintiff was seen in the FCCC medical department with complaints of "gastric pain." Def. Exh. at 99. Plaintiff was examined and evaluated by Dr. Lamour. Id. Plaintiff was prescribed Prilosec. Id.

On March 3, 2010, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 97-98. No complaints are noted about Plaintiff's hernia. Id.

On March 15, 2010, Plaintiff submitted a Sick Call Request stating he is "still having pain in [his] stomach the lower part." Pl. Exh. B-8. Plaintiff was advised he would be scheduled for an appointment. Id.

On March 17, 2010, Plaintiff returned to the FCCC medical department with "continued" abdominal pain. Def. Exh. A at 96. Plaintiff was examined and evaluated by Defendant Webster. Plaintiff stated that Zantac does not help but milk and Prilosec does. Id. Defendant Webster assessed Plaintiff with possible "H. Pylori."[2] Plaintiff was prescribed various medications, and, the same day a nutrition note was written "to add extra milk to breakfast tray to help minimize GI upset." Id.

On April 14, 2010, upon referral by Nurse Dennan, Plaintiff was evaluated by Dr. Lamour for his hernia. Id. at 95. Plaintiff stated the hernia causes "discomfort" and he needs surgery because the hernia goes into his scrotum when he plays basketball. Id. Upon examination, Dr. Lamour found the hernia reducible in the lying and standing position and concluded that there was no change from his previous examination. Id. Plaintiff was told he needed support if he intended to play basketball and was advised to follow up in three months. Id.

On April 22, 2010, Plaintiff was seen in the FCCC medical department and evaluated by Defendant Webster. Id. at 94. Plaintiff stated his stomach "feels better." Id. Plaintiff stated his hernia bothers him post-exercise. Id. His exercise consists of seven to eight sets of 20 sit-ups, pull-ups, push-ups, and squats. Id. Upon examination, Defendant Webster found the hernia was still reducible but fills the scrotum. Id. There was no grimacing by Plaintiff upon examination. Id. Plaintiff was advised to continue regimen. Id.

On May 5, 2010, Plaintiff was seen in the FCCC medical department on other medical issues, not relevant to his hernia. Id. at 91. No complaints are noted about Plaintiff's hernia. Id.

---

[2]H. Pylori, or Helicobacter Pylori "is a spiral shaped bacterium found in the stomach" that causes inflammation of the stomach lining and peptic ulcers. http://medicalcenter.osu.edu.

On May 14, 2010, Plaintiff was seen in the FCCC medical department for complaints of hernia pain. <u>Id.</u> at 92. Plaintiff was examined and evaluated by Dr. Lamour. <u>Id.</u> Dr. Lamour observed a right inguinal and scrotal hernia, but concluded that the hernia was still reducible. <u>Id.</u> Dr. Lamour requested an outside consultation for a surgical evaluation of Plaintiff's hernia. <u>Id.</u> <u>See</u> <u>also</u> <u>Id.</u> at 8. In his request for a consultation, Dr. Lamour noted that Plaintiff's hernia is "difficult to be reduced" and Plaintiff complained that he is unable "to do physical activity (playing basketball and jogging)" due to his hernia. <u>Id.</u>

On or about May 17, 2010, Dr. Neil Fisher, M.D., the Corporate Medical Director for The GEO Group, denied Dr. Lamour's request for an outside surgical consultation. Dr. Fisher decided that "an outside referral was not warranted at [this] point due to the fact that Plaintiff was still playing basketball and exercising and the hernia was still easily reducible." Def. Exh. B, ¶53. Dr. Fisher recommended that Plaintiff be provided with a hernia belt, restrict his activities, be given a low bunk pass, and minimize lifting to 30 pounds. Def. Exh. A at 8.

On July 11, 2010, Plaintiff submitted a Sick Call Request stating he is "having pain in [his] right knee area," and his "left shoulder" and "lower stomach is bothering" him. Pl. Exh. B-5. Plaintiff was advised he would be scheduled for an appointment. <u>Id.</u>

In July 2010, Plaintiff was seen in the FCCC medical department and had an x-ray performed on his knee and had other medical issues, not relevant to his hernia, addressed. Def. Exh. A at 31-32, 81. No complaints are noted about Plaintiff's hernia. <u>Id.</u> at 81.

On August 12, 2010, Plaintiff was seen in the FCCC medical department for other medical issues, not relevant to his hernia. <u>Id.</u> at 30. No complaints are noted about Plaintiff's hernia. <u>Id.</u>

On August 30, 2010, Plaintiff was seen in the FCCC medical complaining about constipation. <u>Id.</u> at 20. Plaintiff was examined and evaluated by Nurse Montgomery. <u>Id.</u> Nurse Montgomery found "inguinal hernia not visible." <u>Id.</u> According to the notes, Plaintiff stated "I can reduce it myself." <u>Id.</u>

On September 2, 2010, Plaintiff was seen in the FCCC medical for a follow up appointment for his hernia and examined by Dr. Lamour. <u>Id.</u> at 20. According to the notes, Plaintiff told Dr. Lamour he is doing "O.K." <u>Id.</u> Upon examination, Dr. Lamour noted there was no bulge and the hernia was still reducible. <u>Id.</u>; Def. Exh. B, ¶57-58.

On August 12, 2010, September 20, 2010, and September 23, 2010, Plaintiff was seen in the FCCC medical department for other medical issues, not relevant to his hernia. Def. Exh. A at 26, 30.   No complaints are noted about Plaintiff's hernia.   Id.   The notes indicate that Plaintiff had returned to physical activity.   Id.

In early November 2010, Plaintiff was sent for an MRI of his right knee.   Id. at 24, 82-83.

On November 10, 2010, Plaintiff was seen in the FCCC medical for a follow up appointment for his hernia and examined by Dr. Lamour. Id. at 23.   According to the notes, Plaintiff told Dr. Lamour that the hernia is getting bigger and interfering with his activities. Id.   Plaintiff stated he wanted surgery.   Id.   Upon examination, Dr. Lamour noted there was a bulge in the right inguinal area extending into the scrotum.   Id.   Dr. Lamour determined that "the hernia was somewhat more difficult to reduce compared to prior visits."   Exh. 2, ¶60.   Nonetheless, Dr. Lamour "determined that conservative treatment was warranted as [Plaintiff] was still playing basketball and exercising."   Id.

On November 22, 2010, Plaintiff submitted a Sick Call Request stating he is "having pain in [his] right groin area concerning [his] hernia."   Pl. Exh. B-10.   Plaintiff stated that the "pain starts" when he plays basketball, eats certain food, jogs, coughs, stands for long periods of time, or sleeps on his stomach.   Id. Plaintiff was scheduled for an appointment.   Id.

On December 2, 2010, Plaintiff was seen in the FCCC medical for a follow up appointment for his hernia and examined by Dr. Lamour. Def. Exh. A at 21.   According to the notes, Plaintiff told Dr. Lamour that the hernia "hurts intermittently" and "interferes with daily activity."   Id.   Upon examination, Dr. Lamour noted there was a bulge in the right inguinal area extending into to the scrotum, but opined that it was still reducible.   Id.; Exh. 2, ¶62.

On December 8, 2010, Plaintiff was seen in the FCCC medical department for other medical issues, not relevant to his hernia. Def. Exh. A at 21.   No complaints are noted about Plaintiff's hernia.   Id.

On January 14, 2011 and February 1, 2011, Plaintiff was seen in the FCCC medical department for other medical issues, not relevant to his hernia.   Id. at 17-20.   No complaints are noted about Plaintiff's hernia.   Id.

On February 3, 2011, Plaintiff came to the FCCC medical department requesting a new knee brace.   Id. at 16.   Plaintiff was   examined

by Nurse Head and Dr. Lamour. Id.; Exh. 2, ¶¶63-66. According to the notes, Plaintiff was "smiling and cooperative," and told them he "plays a lot of sports" so he needs a new brace for his knee. Exh. 1 at 16. Dr. Lamour examined Plaintiff's hernia, during which Plaintiff voiced no pain or discomfort. Id. After the examination, Plaintiff "jumped down from the exam table." Id. Dr. Lamour completed a referral to have Plaintiff examined by an outside specialist for his hernia. Id.

On March 16, 2011, Plaintiff was seen by Dr. Galliano for an outside consultation for right scrotal hernia. Id. at 160. Dr. Galliano examined Plaintiff and recommended "conservative treatment" and a six-month follow up. hernia. Id.

On April 4, 2011, Plaintiff was seen in the FCCC medical department complaining about right groin pain. Id. at 193. Plaintiff stated that "playing basketball" contributes to the pain. Id. Plaintiff was examined by Nurse Lasko who observed a right peritoneal hernia measuring "3" x 1 ½ " x 3/4" out". Id. Plaintiff appeared in "mild distress." Id. Plaintiff was referred to Dr. Lamour for further evaluation and prescribed Ultram, 100mg, for pain. Id.

On May 4, 2011, Plaintiff was seen by Dr. Lamour in the FCCC medical department for a hernia evaluation. Id. at 192. According to the notes, Plaintiff asked when he was going to see the surgeon. Id. Dr. Lamour advised Plaintiff that he was scheduled to see him in six months from the time he was initially evaluated. Id. Plaintiff "got upset and left without being examined." Id.

On May 24, 2011, Plaintiff was seen in the FCCC medical department for other medical issues, not relevant to his hernia. Id. at 190. No complaints are noted about Plaintiff's hernia. Id.

On May 26, 2011, Plaintiff submitted a Sick Call Request stating he is "having pain in [his] right groin area," and "the pain is hurting daily." Pl. Exh. B-11. Plaintiff was advised his issues were addressed by Dr. Lamour on May 24, 2011. Id.

On June 1, 2011, Plaintiff put in a sick call request, complaining that he has not been evaluated by medical. Pl. Exh. B-12. According to the response and entries in Plaintiff's medical file, he either "refused" treatment or was a "no show." Id.; Def. Exh. A at 188.

On August 3, 2011, Plaintiff was seen in the FCCC medical department for a hernia evaluation. Def. Exh. A at 189. Plaintiff stated that the hernia "has not changed." Id. Plaintiff was examined by Dr. Lamour who concluded that the hernia was still

reducible.  Id.; Exh. 2, ¶73.  Dr. Lamour recommended a follow up appointment with Dr. Galliano on September 16, 2011.  Id.

On August 24, 2011, Plaintiff submitted a Sick Call Request stating he is in "daily pain and discomfort" and is "experiencing a pain which feels like something is cutting/pinching" him.  Pl. Exh. B-13.  Plaintiff requested surgery.  Id.  Plaintiff was advised that Dr. Lamour addressed his issue on August 3, 2011.  Id.

On August 25, 2011, Plaintiff went to the FCCC medical department for his hernia.  Id. at 186.  According to the notes, Plaintiff is "placing sick call requesting surgery."  Id.  However before being seen, Plaintiff leaves.  Id.

On September 12, 2011, Plaintiff was seen by Dr. Galliano for a follow up outside consultation for right scrotal hernia.  Id. at 159.  Dr. Galliano examined Plaintiff and again recommended "conservative treatment."  Id.[3]

On September 23, 2011, Plaintiff was seen in the FCCC medical department for other medical issues, not relevant to his hernia.  Id. at 181.  No complaints are noted about Plaintiff's hernia.  Id.

On or about October 24, 2011, Plaintiff met with Dr. Lamour.  Def. Exh. B, ¶76.  Dr. Lamour called Dr. Galliano about Plaintiff's hernia.  Def. Exh. A at 180.  Dr. Galliano agreed to proceed with surgery.  Id.

On October 25, 2011 Dr. Lamour scheduled Plaintiff's surgery.  Id.

---

[3]Plaintiff states that he saw Dr. Galliano on September 24, 2011 for his follow up appointment, at which time Dr. Gallaino allegedly told Plaintiff he was willing to perform the surgery.  Pl. Exh. D-27.  Plaintiff does not produce an affidavit from Dr. Gallaino.  Further, the medical records evidence that the follow up appointment was on September 12, 2011.  Def. Exh. A at 159.  There is writing on the consultation form dated September 12, 2011, stating "conservative treatment."  Id.  In his Affidavit, Dr. Lamour, states that Dr. Galliano would write his findings on the form and return it back to the FCCC with his findings.  Def. Exh. B, ¶69.  Additionally, both the March 16, 2011 and September 12, 2011 referral forms contain a signature purporting to be Dr. Galliano beneath the "conservative treatment" recommendation.  See Pl. Exhs. D-17 and D-23.  Consequently, the Court finds the writing on the form belongs to Dr. Galliano and rejects Plaintiff's unsupported averment that Dr. Galliano was willing to perform surgery prior to October 24, 2011.

On November 3, 2011, Dr. Galliano performed hernia surgery on Plaintiff and Plaintiff was discharged back to the FCCC. Def. Exh. B, ¶79; Def. Exh. A at 179, 201-204.

The record reflects that Plaintiff was provided with pain medication for his hernia, as well as a hernia belt. Def. Exh. B, ¶87. Additionally, Plaintiff was periodically provided various medication for his hernia as well as for his other medical conditions. See generally Def. Exh. A. Specific to his hernia, Plaintiff documents that he received the following medications during the following time periods: Acetamin, 500 mg, from July 14, 2010 through October 12, 2010 (Pl. Exh. D-11); Acetamin, 500 mg, from December 21, 2010 through March 21, 2011 (Pl. Exh. D-18); Acetamin, 500 mg, from March 18, 2011 through June 16, 2011 (Pl. Exh. D-21); Ultram, 100 mg started on April 4, 2011 (Pl. Exh. D-20); Acetamin, 500 mg, from June 3, 2011 through September 1, 2011 (Pl. Exh. D-22); and, Acetamin, 500 mg, from August 19, 2011 through November 17, 2011 (Pl. Exh. D-36).

### B. Discussion

The Court recognizes that as a civilly committed person, Plaintiff's rights are evaluated under the Fourteenth Amendment. Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir. 1996)(citing Youngberg v. Romeo, 457 U.S. 307, 322 (1982)). See also Lavender v. Kearney, 206 F. App'x 860, 862 (11th Cir 2006). However, "the Eighth Amendment's deliberate indifference jurisprudence is applicable to the Fourteenth Amendment due process rights of pre-

trial detainees." Id. at 863 n.2 (citing Purcell v. Toombs County, Ga., 400 F.3d 1213, 1219 (11th Cir. 2005)(other citations omitted)). Consequently, the Court examines cases addressing medical deliberate indifference claims under the Eighth Amendment for guidance in evaluating Plaintiff's claims.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. Amend. VIII. In order to state a claim for a violation under the Eighth Amendment, a plaintiff-prisoner must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Hudson v. McMillan, 503 U.S. 1, 9 (1992)(opining that a prisoner must demonstrate a "serious" medical need "[b]ecause society does not expect that prisoners will have unqualified access to health care. . . ."). This showing requires a plaintiff to satisfy both an objective and a subjective inquiry. Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (citing Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000)).

First, a plaintiff must show that he had an "objectively serious medical need." Id. A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (citations omitted).

"The medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id.

Second, a plaintiff must establish that a defendant acted with "deliberate indifference" by showing: (1) subjective knowledge of a risk of serious harm (i.e., both awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and the actual drawing of the inference); (2) disregard of that risk; and (3) conduct that is more than gross negligence. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005). "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Goebert v. Lee County, 510 F.3d 1312, 1327 (11th Cir. 2007)(quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)). "A difference in medical opinion does not constitute deliberate indifference so long as the treatment is minimally adequate." Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010)(citing Harris v. Thigpen, 941 F.2d 1495, 1504-05 (11th Cir. 1991)). A doctor's decision about the type of medicine that should be prescribed is generally "a medical judgment" that is "an inappropriate basis for imposing liability under section 1983." Adams v. Poag, 61 F.3d 1537, 1547 (11th Cir. 1995); see also Waldrop v. Evans, 871 F.2d 1030, 1033

(11th Cir. 1989)(stating that "[m]ere medical malpractice, however, does not constitute deliberate indifference. Nor does a simple difference in medical opinion."). "When the claim turns on the quality of the treatment provided, there is no constitutional violation as long as the medical care provided to the inmate is 'minimally adequate.'" Blanchard v. White Co. Pet. Ctr. Staff, 262 F. App'x 959, 964 (11th Cir. Jan. 22, 2008)(quoting Harris, 941 F.2d at 1504). For example, the Eleventh Circuit previously found "that a doctor's failure to administer stronger medication . . . pending the arrival of [an] ambulance ... [was] a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983." Id. (citing Adams v. Poag, 61 F.3d 1537, 1547 (11th Cir. 1995)). Consequently, "[d]eliberate indifference is not established where an inmate received care but desired different modes of treatment." Id.

"Deliberate indifference" includes "the delay of treatment for obviously serious conditions where it is apparent that delay would detrimentally exacerbate the medical problem," where "the delay does seriously exacerbate the medical problem," and where "the delay is medically unjustified." Harper v. Lawrence Cnty., 592 F.3d 1227, 1235 (11th Cir. 2010) (quoting Taylor, 221 F.3d 1254, at 1259 (11th Cir. 2000). See also McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999); Harris v. Coweta County, 21 F.3d 388, 393-394 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533,

1537-39 (11th Cir. 1990). A delay of even hours may be deliberate indifference given the "reason for the delay and the nature of the medical need." McElligott, 182 F.3d at 1255. However, "[a]n inmate who complains that delay in medical treatment [rises] to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay." Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir. 1994), abrogated on other grounds Hope v. Pelzar, 536 U.S. 730 (2002). "Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records." Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010)(citations omitted).

Here, Defendants introduce evidence that "[a] hernia is not a serious medical condition unless the hernia will not reduce." Def. Exh. B, ¶84. The Court need not determine at what point, if any, Plaintiff's hernia constituted a serious medical condition because the record evidence demonstrates that Plaintiff received regular and prompt medical treatment for his hernia when he first presented with symptoms, in June 2008, until his surgery in November 2011. Plaintiff regularly was examined by FCCC medical staff, was provided with hernia belts, was provided medication, was advised to wear the belt when engaging in exercise, and was directed to limit his physical activity. Medical staff determined that because Plaintiff's hernia remained reducible, surgery was not necessary.

Evidence reveals that Plaintiff was able to participate in strenuous exercise, including playing basketball and lifting weights from 2008 through 2011. Plaintiff was referred for outside testing and underwent a sonogram of his testicles and right inguinal area. The sonogram of his right inguinal area was negative. Dr. Lamour requested a referral for Plaintiff to an outside specialist for surgical evaluation, but Dr. Fisher,[4] the medical director, determined that a referral was not necessary at this point in time due to the fact that the hernia was easily reducible and Plaintiff was able to play basketball. Dr. Fisher recommended that Plaintiff restrict his activities, not lift over thirty pounds, and be issued a low bunk pass. That Plaintiff failed to comply with the prescribed course of treatment on various occasions from 2008 through 2011 is also evident. On March 16, 2011 and September 16, 2011, Plaintiff was seen by an outside specialist for surgical consultation. After both examinations, the specialist opined that surgery was not warranted and recommended a conservative course of treatment. On October 24, 2011, only after Dr. Lamour spoke with Dr. Galliano, did Dr. Galliano determine that hernia surgery was appropriate. Plaintiff underwent surgery only ten (10) days later. Plaintiff's conclusory allegation that he required a different coure of treatment is based only on his subjective beliefs. The Court finds that the record

---

[4]Dr. Fisher is not named as a defendant.

demonstrates that, at a minimum, the medical care provided to Plaintiff was adequate. The care Plaintiff received for his hernia certainly was not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris, 941 F.2d at 1505.

Further, to the extent that Plaintiff contends that the delay to provide him with the recommended surgery constitutes deliberate indifference, Plaintiff has not provided the Court with any verifiable evidence that the failure to provide the surgery for his hernia caused a detrimental effect on his health. In the absence of such evidence, Plaintiff fails to raise a genuine issue of an essential element of his claim. Further, the undisputed record evidence demonstrates that surgery was not considered because the hernia remained reducible and treatable without surgical intervention. In fact, as noted, the only medical documentation before the Court is that the outside specialist on two occasions opined that Plaintiff's condition did not necessitate surgical intervention. When the specialist determined that surgery would be appropriate, the surgery was performed ten (10) days thereafter. Plaintiff's personal belief that surgery should have been performed earlier and his disagreement with the conservative treatment prescribed by medical staff are not sufficient to demonstrate a claim of deliberate indifference. Jackson v. Jackson, 456 F. App'x

813, 815 (11th Cir. 2012)(citing Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995)).

Consequently, the Court finds that Plaintiff has failed to meet his burden to demonstrate that there is a genuine issue of material fact about whether any of the Defendants were deliberately indifferent to Plaintiff's serious medical needs, or whether the decision to delay surgical intervention and opt for a more conservative course of treatment had any detrimental effect on Plaintiff's medical condition to rise to an Eighth Amendment claim. Because the court is dismissing Plaintiff's federal claims, it chooses not to exercise supplemental jurisdiction over Plaintiff's related state law claims.   See 28 U.S.C. § 1367(a) and (c). Consequently, the Court finds that Defendants are entitled to summary judgment as a matter of law.

ACCORDINGLY, it is hereby

**ORDERED:**

1.   Defendant Budz' Affidavit (Def. Exh. C) is stricken.

2.   Defendants' Motion for Summary Judgment (Doc. #49) is **GRANTED.**

3.   The Clerk shall enter judgment accordingly, terminate any pending motions as moot, and close this case.

**DONE AND ORDERED** at Orlando, Florida, on this _25_ day of

January, 2013.


G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE


SA: hmk
Copies: All Parties of Record

-24-